DEN EX DEM. CORNELIUS C. BANTA AND BRIDGET HIS WIFE, AND RACHEL VAN BUSKIRK v. DAVID DEMAREST.

The words " from the part of his or her mother," in the third section of the act directing the descent of real estates, are so construed as to include estates that come by descent, devise, or ·gift, from any relatives of the blood of the mother, as well as those that come from the mother herself.

This case came before the court on a motion for judgment, for the plaintiff, upon a special verdict found at the Bergen circuit. The facts upon which the question depends, are found stated in the opinion of the court.

The cause was argued before CHIEF JUSTICE and Justices OGDEN and POTTS.

Mr. W. Pennington and Mr. A. S. Pennington, for plaintiff, Mr. Vroom and Mr. Zabriskie, for defendant.

POTTS, J. It appears by the special verdict, that Isaac J. Haring died on the 29th August, 1849, intestate, seized of the premises in question, leaving an infant grandchild, John Demarest, his sole heir at law; this child being the son of the intestate's daughter and only child, Ann Eliza, who married David Demarest. She died *before* her father, and left no other issue. Upon the decease of Isaac J. Haring, the estate descended to John, who died in infancy, a few days *after* his grandfather. David Demarest claims the land as

heir to his son John. The lessees of the plaintiff, Bridget and Rachel, are the only surviving sisters of Isaac J. Haring, there being no brothers. And the question in the case is, did the land, upon John's decease, go to his father, the defendant, or to his grandfather's sisters, the lessors of the plaintiff, under the provisions of the third section of the act directing the descent of real estates, *Rev. St.* 337.

The language of that section is, "that when any person shall die seized of any lands, &c., without devising the same in due form of law, and without leaving lawful issue, and without leaving a brother or sister of the whole blood, or any lawful issue of any such brother or sister, *leaving a father*, then the inheritance shall go to the father of the said person so seized, in fee simple, *unless* the said inheritance came to the person so seized, *from the part* of his or her mother by descent, devise or gift, in which case it shall descend *as if such person so seized had survived his or her father.*"

What is the meaning of the words "from *the part* of his, or her mother by descent?" The answer to this will solve the question in the cause.

The mother was never seized ; she died before her father. But the land came to John from the ancestor of his mother.

If the words "from the part of his mother" mean simply from the mother herself, as is contended on the part of the defendant, then, as the land did not descend to John from his mother, the father is not excluded from the inheritance, but will take the estate as heir at law of his son. But if, on the other hand, these words have a broader and more extensive signification, and mean from the line, the ancestors, the blood of the mother as well as from the mother herself, as is insisted in this part of the lessors of the plaintiff, then the father is excluded, and the lands descend as though John had survived his father. And it is conceded that if this be the true construction, the lessors of the plaintiff are entitled to recover.

I am clearly of opinion that the latter construction is the true one, for—

Banta et al. v. Demarest.

1. If the legislature had intended to exclude the father, only in case the land came from the mother herself, it is remarkable that they did not say so; that, in so important a matter as the regulation of the descent of estates, they should have inserted the words "part of," where, if they mean any thing at all, they must mean something more than from the mother herself.   And in searching for the meaning of the statute, we are bound to give effect to every word used in the statute, unless by so doing, a result follows, clearly inconsistent with its spirit and intent.

2. I think this construction is in accordance with the manifest spirit and intention of the act.   It is admitted that if the land had come to John directly from his mother—if she had survived her father, inherited, and then died, the son living, and then the son had died, the father would have been excluded from the inheritance by force of the statute, and the land would have gone back to the sisters of the grandfather. The object of the statute is to limit the inheritance to the blood of the ancestor from whence it came; and the reason of the rule applies as well to the case, where the son takes by descent from his maternal grandfather, as where he takes by descent directly from his mother.   In both cases the inheritance comes from the line of the maternal blood.   To warrant the court therefore, in adopting the principle that the rule is changed, by the accident of the death of the mother, before the descent is cast upon her—that the rule ceases before the reason of the rule ceases, we should see that we have clear authority in the language of the statute for it.   The rule itself has a strong foundation in the equity that springs from the consideration, that in cases of descent the estate comes, not as the fruit of the industry of the heir, but the bounty of the ancestor.

3. The phrases *ex parte materna* and *ex parte paterna*, have a well known signification in the law.   They are found constantly used in the books to denote the line, or blood of the mother or father, and have no such restricted or limited sense, as from the mother or father, exclusively.   *Jackson* v. *Lyon,* 9 *Cowen,* 664; *Den* v. *Jones* and *Searing, 3 Hal.* 348; 2

*Blackstone's Com.* 224, *note* (25), 225, *note* (26), &c.   And it is reasonable to suppose the legislature intended to use the words in the unrestricted sense in which they are commonly used.

4. The third section of the act of 1780, which was the first act changing the common law rule of descent, directed, that when any person died, seized of real estate, intestate, leaving no brothers or sisters of the whole blood, and leaving brothers or sisters of the half blood, the estate should descend to them; and the question as to the construction of this section, first came up in the case of *Den* v. *Urison,* 2 *Penn.* 212.   The majority of this court there held, notwithstanding the plain language of the section, that it meant only her brothers and sisters of the half blood, on the side of the parent through whom the land descended.   But in the subsequent case of *Arnold* v. *Den,* in *Southard R.* 862, the Court of Errors held to the literal meaning of the words of the section, and overruled the former case.   Prior to the decision of the last case, the legislature repealed this section of the act of 1780, and passed an act, Feb. 15, 1816, which expressly excluded all those who were not of the blood of the ancestor, from whom the estate came, from inheriting.   This act was repealed and supplied by the 5th section of the act of 1817, *Rev. St.* 609, which again expressly excluded from the inheritance in such cases, all who were not of the ancestral blood, through which the estate came; and with the same exclusive proviso, this act was re-adopted in the revision of 1846, *Rev. St.* 339, *Sec.* 5.   So that there is not, on the whole, any thing in the course of legislation or judicial construction in this state, which evinces any intention to abandon the general rule.   The question in the case of *Den* v. *McKnight,* 6 *Hal.* 385, which was referred to, in the argument, arose under the act of 1780, and the court then followed the construction given to the third section in *Den* v. *Arnold.*

Upon the whole, let judgment be entered for the plaintiff.

The CHIEF JUSTICE and Justice OGDEN concurred.